**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: ) | CHAPTER 7 |
| ) | |
| ELROD HOLDINGS CORP., ) | Case No. 06-11164 (BLS) |
| et al., ) | (Jointly Administered) |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| ELWAY COMPANY, LLP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Adversary No. 07-51576 |
| GEORGE L. MILLER in his ) | |
| capacity as Trustee to Elrod ) | |
| Holdings Corp., et al.; JACK ) | |
| K. ELROD COMPANY, INC.; ) | |
| FIFTH THIRD BANK (OHIO); ) | |
| RESERVE MEZZANINE FINANCE, ) | |
| LLC f/k/a BRANTLEY MEZZANINE ) | |
| FINANCE, LLC; and WEBSTER ) | |
| GROWTH CAPITAL CORP., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| GEORGE L. MILLER, in his ) | |
| capacity as Trustee to Elrod ) | |
| Holdings Corp., et al. ) | |
| ) | |
| v. ) | |
| ) | |
| ELWAY COMPANY, LLP; JEFFREY ) | |
| L. ELROD; DALE K. ELROD; ) | |
| MARYANN WAYMIRE; MIDWEST ) | |
| SEATING CORPORARTION; ) | |
| NUSSLI, LLC; KENDALL ) | |
| INDUSTRIES, INC. f/k/a ELROD ) | |
| CORPORATION ) | |
| _____ ) | |

**OPINION**[1]

Before the Court are motions ("the Motions") [Docket Nos. 67 and 134] by Elway Company, LLP ("Elway") and Jeffrey L. Elrod, Dale K. Elrod, and Mary Ann Waymire (collectively, the "Elrods") for partial summary judgment on four claims made against them by George L. Miller (the "Trustee"). The Trustee seeks (i) avoidance of allegedly fraudulent transfers to Elway and the Elrods, and (ii) equitable subordination of Elway's secured and unsecured claims. The Elrods and Elway assert that no genuine issue of material fact exists preventing summary judgment on these claims. The Court finds that the Elrods and Elway have met their burden of demonstrating that no genuine issue of material fact exists with respect to the fraudulent transfer claims, and accordingly will grant the Motions as they relate to those claims. The Court will deny the Motions as they relate to the equitable subordination claims.

I.   PROCEDURAL BACKGROUND

On October 26, 2006 (the "Petition Date"), Jack  K. Elrod Company, Inc. ("JKE"), and Elrod Holdings Corp. ("Elrod Holdings") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code (the

---

[1] This opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2

"Code").  The Trustee was subsequently appointed as the Chapter 7 trustee and the Court ordered the joint administration of the Debtors' estates.

On September 7, 2007, Elway commenced this adversary proceeding by filing a complaint (the "Complaint") [Docket No. 1].  Elway is a limited liability partnership that is wholly owned by the Elrods.  Dale Elrod is Elway's managing partner and Jeff Elrod is a general partner.  Elway sought (i) a determination of the validity, extent, and priority of its purported liens, and (ii) allowance of its claims against the Debtors' estates.  The Complaint named JKE, the Trustee, and several of the Debtors' creditors as defendants.

On December 5, 2007, the Trustee filed an answer (the "Answer") [Docket No. 10] to the Complaint.  In the Answer, the Trustee included twenty-one counterclaims against the Elrods, Elway, and several other entities.  The Trustee asserted, among other things, claims against the Elrods and Elway based on alleged fraudulent transfers and conveyances.  On April 24, 2008, the Trustee filed an amended answer [Docket No. 47], which included amended counterclaims (the "Amended Counterclaims") that are substantially similar to his original Counterclaims.

In broad brush, the Trustee's Amended Counterclaims allege that the Elrods participated in a scheme whereby they stripped the Debtors of assets.  Specifically, the Trustee alleges that

3

the Elrods owned JKE and sold it to Champlain Capital Partners, L.P. ("Champlain"), and when Champlain left the Elrods in control of JKE's day-to-day operations, they used Elway to engage in a series of self-dealing, fraudulent transactions with JKE that resulted in the depletion of JKE's assets and their own enrichment.  Accordingly, the Amended Counterclaims contain a number of fraudulent transfer and conveyance claims.  Seventeen of the Trustee's original claims have been withdrawn and dismissed by the Trustee or adjudicated by this Court's rulings. The remaining four claims are described below.

## II.  FACTUAL BACKGROUND

Founded in 1965, the Debtors were engaged in the business of designing, manufacturing, installing and maintaining spectator seating for motor sports raceways and college and high school athletic facilities, manufacturing and installing SAFER wall (an energy absorption system for raceway safety), and renting bleacher seating for various events.  Immediately prior to April 15, 2005, JKE was owned and controlled by the Elrods.

*A.   The Leveraged Buyout*

On April 15, 2005 the Elrods entered into a stock purchase agreement whereby they sold  75% of their equity stake in JKE to Champlain for approximately $35 million (the "Buyout").  JKE incurred substantial indebtedness in connection with the transaction: two banks (Fifth Third Bank - Michigan and Fifth

4

Third Bank - Ohio) put up $5.5 million and $7.5 million, respectively, in exchange for secured notes; two mezzanine lenders (Brantley Mezzanine Finance LLC and Webster Growth Capital Fund (together, the "Mezzanine Lenders")) loaned $9.5 million collectively, also receiving secured notes in exchange. The Elrods, for their part, received approximately $26.5 million in cash, a $3.5 million subordinated note secured by cash collateral held in a restricted account at Fifth Third Bank - Michigan to support JKE's line of credit (the "$3.5 Million Note), a $2.3 million note secured by a separate deposit account at Fifth Third Bank - Michigan (the "$2.3 Million Note"), and a contingent, subordinated earn-out note whose payout depended upon JKE's meeting certain business milestones.

The Elrods also received the right to appoint two directors of JKE.  Dale and Jack Elrod were selected to fill these seats. Champlain appointed three additional board members, which later grew to five.

Champlain left substantial operational control in the hands of the Elrods.  Jeff Elrod was the company's President and Dale Elrod was Vice President.  Two of Jeff Elrod's sons also worked for JKE.  Champlain installed Kenneth Knapick as CFO and Dennis Leary as Treasurer.

B.    *Performance Bonding*

After the April 15, 2005 Buyout, JKE's  financial condition

deteriorated quickly.  For the year ended December 31, 2004,
JKE's net income before taxes was approximately $4.7 million.
For the year ended December 31, 2005 (about eight months after
the Buyout), JKE reported negative net income before taxes of
approximately $7.5 million.  In an effort to prop up the company,
Champlain contributed $2.7 million of additional capital.  Elway
purchased certain of JKE's receivables for cash, and entered into
a sale and leaseback of some of JKE's computer and telephone
equipment.  These transactions provided additional cash for JKE's
operations, but also transferred ownership of  many of JKE's
assets to Elway.

     In addition to -- and at least in part because of -- this
financial decline, JKE began to have difficulty securing
performance bonding for future projects from its existing surety
provider, Safeco.  As is common in the construction industry,
many of JKE's large and expensive projects required performance
bonding, whereby Safeco would issue a surety bond in favor of one
of JKE's customers to guarantee satisfactory completion of the
project.

     Near the end of 2005, JKE requested that Safeco increase its
bonding support to $10 million for a single project and $20
million in the aggregate.  JKE claimed to need additional bonding
because it expected to secure an assignment to install seating at
the Cotton Bowl in Texas.  Safeco insisted that JKE provide

additional collateral of $3.5 million (doubling what had previously been required), which could take the form of cash or of $2.5 million cash plus a full personal guaranty from the Elrods.  (Partin Aff. 4.)  A resolution to these negotiations was important to the viability of the company.  Revenue from bonded jobs comprised the bulk of JKE's income, and thus, without performance bonding, JKE would soon have to cease operations. (D. Elrod Dep. 296-97.)

C.   *The Restructuring*

By June 2006, JKE was in default under its loan agreements with Fifth Third Bank.  On August 18, 2006, JKE, the Elrods, Elway, and JKE's lenders restructured the company's debt obligations (the "Restructuring").  In connection with the Restructuring, the following occurred:

- Fifth Third Bank - Michigan's senior note was paid in full, made possible in part by the Elrods' release of their security interest in the $2.3 deposit account at Fifth Third Bank - Michigan;

- Fifth Third Bank - Ohio, Champlain, and the Mezzanine Lenders each converted a portion of their debt to equity, reducing the Elrods' fully diluted equity stake to about 18%;

- Elway loaned JKE $1.6 million (the "$1.6 Million Note");

7

- Elway purchased JKE's machinery and equipment for $4.7 million cash, then leased it back to JKE at a cost of $60,000 per month (the "M&E Sale Leaseback");

- The Elrods' $3.5 Million Note was paid in full (the "Wire Transfer");

- Champlain substituted its own $3.5 million letter of credit in favor of Safeco for the one previously written by the Elrods;

- Every party to the Restructuring entered into a mutual release agreement (the "Release"), releasing one another from any and all claims they may have had against each other at any time.

The Restructuring was approved by JKE's board of directors, which at the time consisted of Dale and Jeff Elrod, Dennis Leary from Champlain, and two other directors appointed by Champlain.

Simultaneously with the Restructuring, the Elrods, Elway, JKE and Champlain entered into a Bonding Collateral Agreement (the "Bonding Collateral Agreement"), whereby the Elrods agreed to provide additional collateral of $3.5 million in favor of Safeco.  The Trustee characterizes this agreement as vital to the whole Restructuring, the lubricant without which the company would simply have ground to a halt: "Without question, the Bonding Collateral Agreement . . . played a critical role in inducing the Debtors, Champlain, and the Debtors' Secured Lenders

8

to enter into and perform the August 2006 Restructuring. . . . [T]he very survival of the Debtors . . . was dependent upon the continued availability of Safeco's performance bonding." (Trustee's Omnibus Objection 16.)

D.    *The Bankruptcy Petition*

The Restructuring brought temporary relief to JKE, but it was short-lived.

On September 7, 2006, representatives of Safeco met with Dale Elrod and Ken Knapick (JKE's CFO) to discuss future performance bonding for JKE.  Dan Partin of Safeco testified that Safeco was prepared to continue to bond JKE's projects, and Partin assumed in advance of the meeting that the Elrods would put up additional collateral as requested.  (Partin Aff. 5.)  To his surprise, the Elrods insisted that no further collateral should be required.  Id.  The Trustee alleges that the Elrods intentionally hid from Safeco the fact that they had already entered into the Bonding Collateral Agreement, which required them to provide additional collateral.  After the negotiations broke down at the September 7 meeting, Safeco withdrew bonding for JKE.

By early October, 2006, JKE was in default under its leases with Elway.  JKE had run out of money to pay the rent due under the leases.  The Elrods terminated all leases between Elway and JKE, including the machinery and equipment lease, leaving JKE

9

without equipment to operate.

JKE, having substantial liabilities and insufficient revenues to support its obligations, filed for relief under Chapter 7 of the Code on October 16, 2006.  After the petition date, the Elrods fired the majority of JKE's employees, immediately rehiring them as employees of Midwest Seating Corporation ("MSC"), another Indiana corporation created by the Elrods.  Having purchased (through Elway's sale and leaseback transactions) substantially all of JKE's assets, and now employing much of JKE's workforce and occupying JKE's operational facilities, MSC commenced operations in the spectator seating business.  The Trustee characterizes this as the consummation of a fraudulent scheme; Elway and the Elrods argue that this was simply the best response to an unfortunate business setback, and was motivated by a desire to save the jobs of those who had worked with the Elrods for many years.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. R. 56(c).  The Elrods and Elway bear this burden of proof.

To defeat a motion for summary judgment, the Trustee must

10

"designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Summary judgment is inappropriate "if the dispute about a material fact is genuine," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), or if "a reasonable jury could return a verdict for the non-moving party." Whaling v. Atlas Van Lines, Inc., 919 F. Supp. 168, 169 (E.D. Pa. 1996) (citing Anderson, 477 U.S. at 248).

## IV.   JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (H).

## V.   THE PARTIES' POSITIONS

*A.   The Trustee's Position*

Of the Trustee's original twenty-one counterclaims, four are at issue here.  First, in Claim Seven of the Trustee's Amended Counterclaims, the Trustee alleges that the Elrods and Elway "participated and/or aided and abetted in the [M&E Sale Leaseback], with the actual intent to hinder, delay, and/or defraud the Debtor's creditors." He also alleges that the M&E Sale Leaseback was constructively fraudulent.  Thus, he seeks to recover damages for "an amount equal to the amount paid by the

Debtors less the value the Debtors received in exchange therefore."

The Trustee's second claim, Claim Nine of the Trustee's Amended Counterclaims, similarly alleges intentional and constructive fraudulent transfers with respect to the Release, and requests the same damages.

The Trustee's third claim, Claim Twelve of the Trustee's Amended Counterclaims, in like manner alleges intentional and constructive fraudulent transfers with respect to the Restructuring, and also requests the same damages.  Specifically, the Trustee seeks to avoid the Wire Transfer to the Elrods and the $1.6 Million Note payable to Elway, each of which resulted from the Restructuring.

The Trustee's fourth and final claim, Claim Fourteen of the Trustee's Amended Counterclaims, seeks equitable subordination of Elway's claims against the debtor.

The Trustee alleges that the Elrods, without ever intending to perform their obligations under the Bonding Collateral Agreement, manipulated Elway and "defrauded and tricked" JKE, Champlain, and each of JKE's lenders to enter into the Restructuring.  Then, having received millions of dollars through the Buyout and Restructuring, the Elrods failed to post additional collateral as required by the Bonding Collateral Agreement, assuring JKE's demise. Having stripped JKE of assets,

12

the Elrods simply continued the former business under a new corporate charter (MSC), leaving JKE to file for bankruptcy relief.

Based on this characterization of the facts, the Trustee argues that Elway's and the Elrods' actions constitute actual intent to hinder, delay, or defraud.  Acknowledging that "the intent of the debtor is the focus of the inquiry," the Trustee argues that "[b]ecause Dale and Jeff Elrod were officers, directors, and shareholders of JKE, and, along with their sister [Mary Ann Waymire], maintained a 100% ownership interest in Elway, their fraudulent intent can be imputed to the Debtors for purposes of 11 U.S.C. § 544 and § 548."  (Trustee's Omnibus Objection 28, 34.)

He also argues that Elway's $1.6 Million Note should be subordinated because Elway's actions were inequitable and injurious to the Debtors, and because subordination would not be inconsistent with the Bankruptcy Code.  He further argues that "the transactions between Elway and JKE must receive increased scrutiny precisely because the Elrods' insider status gave them a heightened ability [to engage in] inequitable conduct," and that "it is of no moment whether Elway itself was an insider of JKE." (Trustee's Omnibus Objection at 41.)

13

B.   *Elway's and the Elrods' Position*

Elway and the Elrods argue that summary judgment is appropriate with respect to the Trustee's fraudulent transfer claims (Claims Seven, Nine and Twelve) because the Trustee has produced no evidence that JKE made the transfers at issue with actual fraudulent intent under Bankruptcy Code § 544 or § 548(a)(1)(A), nor under the Indiana Uniform Fraudulent Transfer Act, Ind. Code § 32-18-2-14 (the "UFTA"). Elway's and the Elrods' intent as transferees is irrelevant, they claim, because the statute directs the court to consider only the debtor-transferor's intent. Elway disputes the Trustee's claim that Elway or the Elrods controlled JKE, pointing out that the Elrods held only two of at least five board seats, and that the transactions at issue were negotiated at arms length and approved by Champlain after consultation with qualified counsel. They argue further that the narrow exception allowing imputation of a transferee's intent to a transferor requires "virtually complete control" by the transferee of the transferor. (Elway Reply at 7.)

Further, they argue that even if their intent as transferee was relevant, the Trustee has produced no evidence of intent to hinder, delay, or defraud. On the contrary, the Elrods and Elway provided JKE with much-needed liquidity at a critical time, they claim, and there is no evidence of intent to hinder, delay or

14

defraud creditors.

Responding to the Trustee's constructive fraudulent transfer claims in the Complaint, they argue that they paid reasonably equivalent value for what they received from JKE: the machinery and equipment, the $1.6 Million Note, the $3.5 million Wire Transfer, and the Release.

The Elrods and Elway also challenge the Trustee's allegation of inequitable conduct which would support an equitable subordination claim. In particular, they deny the Trustee's allegations about the centrality of the Bonding Collateral Agreement and the Elrods' alleged entry into that agreement with intention to breach it. Contrary to the Trustee's portrayal of the facts, the Elrods claim that they did in fact intend to provide the required collateral to Safeco, but that Safeco unreasonably required unlimited personal guaranties, and eventually refused to provide bonding even if such guaranties were given.

V.  <u>DISCUSSION</u>

*A.  Fraudulent Transfers*

Claims Seven (M&E Sale Leaseback), Nine (Release) and Twelve (Restructuring) all allege fraudulent transfers, presenting common issues for the Court's consideration. Section 544 allows a trustee to avoid any transfer or obligation that is avoidable under state law, in this case the Indiana UFTA, which is, for

practical purposes relevant to this case, the same as Code

Section 548.  Section 548 allows a trustee to avoid both "actual

intent" fraudulent transfers and constructively fraudulent

transfers.  Section 548 provides, in relevant part, as follows:

> (a)(1) The trustee may avoid any transfer . . . of an
> interest of the debtor in property, or any obligation .
> . . incurred by the debtor, that was made or incurred on
> or within 2 years before the date of the filing of the
> petition, if the debtor voluntarily or involuntarily --
> (A) made such transfer or incurred such obligation with
> actual intent to hinder, delay, or defraud any entity to
> which the debtor was or became, on or after the date that
> such transfer was made or such obligation was incurred,
> indebted; or (B) (i) received less than reasonably
> equivalent value in exchange for such transfer or
> obligation; and (ii) (I) was insolvent on the date that
> such transfer was made or such obligation was incurred,
> or became insolvent as a result of such transfer or
> obligation; (II) was engaged in a business or a
> transaction . . . for which any property remaining with
> the debtor was an unreasonably small capital; (III)
> intended to incur, or believed that the debtor would
> incur, debts that would be beyond the debtor's ability to
> pay as such debtor's matured . . . .

11 U.S.C. § 548(a)(1).


1.   <u>Intentional Fraudulent Transfers</u>

Turning first to the Trustee's "actual intent" fraudulent

transfer claims, both parties acknowledge that the central focus

of § 548(a)(1)(A) is the debtor's intent: the statute allows the

trustee to avoid a transfer "if the <u>debtor</u> voluntarily or

involuntarily made such transfer . . . with actual intent to

hinder, delay, or defraud."  <u>Id.</u>; <u>see also</u> <u>Silverman v. Actrade</u>

<u>Capital, Inc., (In re Actrade Fin. Techs. Ltd.)</u>, 337 B.R. 791,

16

808 (Bankr. S.D.N.Y. 2005) ("Cases under § 548(a)(1)(A) indicate

that it is the intent of the transferor and not the transferee

that is relevant for purposes of pleading a claim for intentional

fraudulent conveyance under the Bankruptcy Code.").  Elway and

the Elrods argue that there is no evidence of any bad intent on

the part of JKE; the Trustee argues that the Elrods' actual

intent to hinder, delay, or defraud should be imputed to JKE

because they dominated or controlled JKE.  This doctrine is

sometimes called the intent imputation doctrine,  and is best

summarized by this statement from Collier on Bankruptcy:

> When the transferee or obligee is in a  position to
> dominate or control the debtor's disposition of his
> property, however, his intent to hinder, delay or defraud
> creditors may imputed to the debtor so as to render the
> transfer  fraudulent  within  section  548(a)(1)(A),
> regardless of the actual purpose of the debtor
> transferor.

5 Collier on Bankruptcy ¶ 548.01 at 548-24 (Alan N. Resnick &

Henry J. Sommer eds., 15th ed. 2009); see also Jackson v. Miskin

(In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 445 (S.D.N.Y

2001) ("Under the domination or control rule, the requisite

intent derives from a transferee who is in the position to

dominate or control the debtor's disposition of his property, a

circumstance that § 548(a)(1)(A) anticipates by its provision

that the fraudulent conveyance by the debtor may be voluntary or

involuntary.").  Elway dismisses the statement in Collier as a

"general statement" unsupported by the cases it cites (and the
Trustee cites) for support, correctly noting that in each of
those cases the transferee exercised virtually complete control
over the transferor, often as a sole shareholder.  See Moore v.
Grasso (In re Formaggio Mfg., Inc.), 23 B.R. 688 (Bankr. D.R.I.
1982); Pirrone v. Toboroff (In re Vaniman Int'l Inc.), 22 B.R.
166 (Bankr. E.D.N.Y. 1982); Freehling v. Nielson (In re F&C
Servs., Inc.), 44 B.R. 863 (Bankr. S.D. Fla. 1982).

The same argument was made by the transferees in the Adler
case, which contains a particularly thorough discussion of the
intent imputation doctrine.  See 263 B.R. at 443 ("[Transferees]
contend that the exception is narrowly limited to cases in which
the transferee's domination or control over the debtor's
management of its business decisions is complete, as when the
debtor is essentially the transferee's alter ego, a wholly-owned
entity or a controlled corporate subsidiary.").  Adler clarifies
that domination or control is but one part of a three-part test
for intent imputation: "First is that the controlling transferee
possesses the requisite intent to hinder, delay, or defraud the
debtor's creditors.  Second, the transferee must be in a position
to dominate or control.  And third, the pertinent domination and
control relates to the debtor's disposition of his property."
Id.  A moving party must satisfy all three of these elements to
qualify for the transferee intent exception and avoid application

18

of the default rule, which is that the debtor's intent controls. The Court adopts the <u>Adler</u> test for intent imputation, and will examine each element in turn.

     *a. Transferee Intent*

As an initial matter, the relevant transferee must be identified. With respect to the Release, both Elway and the Elrods received releases from all other parties, so both are relevant transferees. Pursuant to the Restructuring, the Elrods received the Wire Transfer and Elway received the Note, so both are relevant transferees in connection with the Restructuring. Finally, with respect to the M&E Sale Leaseback, Elway (and not the Elrods personally) purchased machinery and equipment from JKE. Elway is therefore the relevant transferee, and its intent is relevant to the M&E Sale Leaseback. But Elway, "being an entity created by law, is incapable of formulating or acting with intent. Thus, for the purpose of recovering impermissibly transferred corporate assets, and thereby facilitating creditor recovery, the intent of the [partners] may be imputed to the [partnership]." <u>In re James River Coal Co.</u>, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007). Accordingly, though the actual transferee may be Elway or the Elrods depending on the transaction at issue, it is the Elrods' actual intent to hinder, delay, or defraud, or lack thereof, which is at issue, and which would be imputed to the debtor if the three-part imputation test

19

were met in full.

As a general rule, fraudulent intent is found on the basis of circumstantial evidence because "fraudulent intent is not susceptible to direct proof." In re Vaniman Int'l Inc., 22 B.R. at 182. A prima facie case of fraudulent intent can be established by offering proof of various badges of fraud. In re First Fin. Assocs., 371 B.R. 877, 892 (Bankr. N.D. Ind. 2007). Such badges of fraud include the following: "(1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance." Rosener v. Majestic Mgmt. (In re OODC, LLC), 321 B.R. 128, 140 (Bankr. D. Del. 2005). Allegations of fraud must be pled with particularity. Fed. R. Bankr. P. 7009.

The Trustee argues that numerous badges of fraud are present in this case: there is a close relationship between the Elrods and JKE, the Elrods knew of JKE's insolvency, and JKE retained the machinery and equipment under the M&E Sale Leaseback after the putative transfer. The Trustee further alleges that JKE's representations that it would receive the Cotton Bowl project were a sham, "merely another lie in a string of lies perpetrated

by the Elrods, designed to induce JKE's shareholders into
consummating a restructuring out of which the Elrods would
extract millions of dollars in assets from the Debtors to the
detriment of the Debtors'creditors."  (Trustee's Omnibus
Objection 32.)  And, as described above, the Trustee points to
the Elrods' failure to honor the Bonding Collateral Agreement,
and Dale Partin's affidavit declaring such failure to be the
catalyst for Safeco's withdrawal of bonding protection, as
evidence of the Elrod's fraudulent intent.

     The Elrods and Elway reply that the evidence shows that all
parties involved entered into the restructuring to benefit
creditors, not to harm them.  They point to the depositions of
Kenneth Knapick and Dennis Leary, who testified that JKE
participated in the Restructuring (which included the Release and
the M&E Sale Leaseback) to avoid foreclosure by Fifth Third Bank
- Michigan, and to obtain sufficient funds to pay JKE's other
creditors.  (Leary Dep. 110-114.)  They also argue that a very
important badge of fraud is lacking here: inadequacy of
consideration.  With respect to the Cotton Bowl project, they
submitted as evidence an e-mail that Dennis Leary sent the Elrods
on July 28, 2006 (weeks before the restructuring) asking the
Elrods when the project "might get signed." (E-mail of D. Leary,
Ex. 42 to Leary Dep.) This demonstrates that Leary understood the
contingent nature of the Cotton Bowl revenues, and contradicts

the Trustee's assertion that those revenues induced Champlain to undertake the Restructuring.

The Trustee has provided the Court with some evidence that certain badges of fraud are present in this case.  Were this a case where solely the debtor's intent was at issue, this showing of the Elrods' intent might be adequate to defeat summary judgment.  But in this case the Trustee must satisfy the other two prongs of the <u>Adler</u> test, which are concerned with whether a transferee's intent may properly be imputed to a debtor.

   b. *Position to Control*

The second element of the <u>Adler</u> test is that the transferee was in a position to dominate or control the transferor.  When a transferee dominates or controls the transferor, attribution of that person's fraudulent intent to the transferor may be justified; the "property passes, for all practical purposes, from one hand to the other of the same person, ending with the intended transferee."  <u>In re Adler</u>, 263 B.R. at 447-48 (describing the principles that justify intent attribution, including insider status, agency principles, fiduciary duty to the transferor, and prevention of misuse of the corporate form).

As Elway and the Elrods suggest, however, "the cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee."  <u>Armstrong v. United Bank of Bismarck (In re</u>

22

<u>Bob's Sea Ray Boats, Inc.</u>), 144 B.R. 451, 459 (Bankr. N.D. 1992).
Even in the <u>Adler</u> case, in which the District Court for the
Southern District of New York expounded approvingly on the intent
attribution doctrine, the court reversed the lower court's
decision to impute the transferee's intent to the debtor.

Cases imputing a tranferee's intent to a transferor have
typically involved sole shareholders of the transferor, with
complete control of the transferor, transferring assets to
themselves as transferee.  <u>See, e.g.</u>,  <u>In re Formaggio Mfg.,
Inc.</u>, 23 B.R. at 691; <u>In re Vaniman Int'l Inc.</u>, 22 B.R. at 169.
In this case, the Trustee argues that the Elrods exercised near-
complete control, because, among other things, "Jeff and Dale
Elrod were the only board members of JKE who were actually
involved in the day-to-day management of the Company," and were
the only board members who lived in Indianapolis.  <u>See</u> Trustee's
Omnibus Objection 34-36; <u>see also</u> Dep. Tr. D. Leary, p. 262-63.
Knapick, the CFO appointed by Champlain, testified that he was
relegated to a role of a mere bookkeeper, and that he was not
fully informed about JKE's business affairs. (Knapick Dep. 126-
129.) The Trustee argues that these circumstances, coupled with
"the force of the Elrods' personalities," allowed the Elrods to
control the Debtors, despite the fact that Champlain had
appointed at least three of its own directors at all relevant
times.   (Trustee's Omnibus Objection 37.)

These facts may indeed establish that the Elrods maintained
a high degree of functional, as opposed to formal, control of
day-to-day operations at JKE.  But the Trustee has cited no case
in which a court found it appropriate to impute the fraudulent
intent of a transferee to a transferor on such grounds.  Courts
have required formal, legal control as well as functional
control.  The Trustee therefore has failed to satisfy this
element of the <u>Adler</u> intent imputation test.

> *c. Disposition of the Debtors' Property*

The third prong of the intent imputation test is whether
the pertinent domination and control relates to the debtor's
disposition of its property.  The Trustee claims that the Elrods
controlled the information flow at JKE, keeping Champlain out of
the loop.  He also claims that the Elrods were in charge of JKE's
day-to-day operations.  But such alleged control does not
necessarily relate to disposition of the Debtors' property.

The Elrods have submitted into evidence the relevant
transaction documents, which show that the transfers at issue
were approved by Dennis Leary on behalf of JKE and signed by the
directors appointed by Champlain.  Champlain-appointed directors
constituted a majority of the board.  The Elrods and JKE were
counterparties in these transactions, and each side was
represented by counsel.  These facts are undisputed.  Therefore,
as a matter of law, neither the Elrods nor Elway can be said to

24

have controlled JKE with respect to the transfers at issue.
Imputation of their intent to JKE would be improper.   The
Trustee's "actual intent" fraudulent transfer claims fail.

    2.  <u>Constructive Fraudulent Transfers</u>

    In his Amended Counterclaims, the Trustee, reciting the
language of § 548(a)(1)(B), alleges that "the Debtors failed to
receive reasonably equivalent value in exchange for [the M&E Sale
Leaseback, the Release, and the Wire Transfer and $1.6 Million
Note] at a time when (i) the Debtors were insolvent, (ii) the
Debtors were engaged in business for which its remaining property
constituted unreasonably small capital for its needs, and/or
(iii) Elway and the Elrod Family knew, or should have known that
the Debtors would incur additional debts that would be beyond the
Debtors' ability to pay such debts as they matured."  (Amended
Counterclaims 21-25.)

    In analyzing constructive fraudulent transfer claims under
both § 548 and Indiana's UFTA, the "touchstone is whether the
transaction conferred realizable commercial value on the debtor
reasonably equivalent to the realizable commercial value of the
assets transferred."  <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc.</u>,
945 F.2d 635, 647 (3d Cir. 1991).  A court may consider both
direct and indirect economic benefits the debtor receives.  <u>Id.</u>
at 646-47.

    The Elrods and Elway have introduced evidence demonstrating

that JKE received reasonably equivalent value in exchange for each of the transfers.  They have produced an appraisal of the machinery and equipment sold to Elway in the M&E Sale Leaseback, which places its value at roughly $4.65 million; Elway paid $4.7 million.  Elway has produced evidence in the form of an affidavit that the rental payments under the leaseback reflect a below-market interest rate, operating to JKE's advantage.  (Aff. D. Elrod, Ex. C, Docket No. 68,  ¶ 23.)  The Trustee has produced no evidence to the contrary.  The Court therefore finds that reasonably equivalent value was given for the M&E Sale Leaseback.

In connection with the Restructuring, Elway loaned $1.6 million to a financially unstable company.  In exchange, it received a secured note bearing an interest rate of prime plus 1.25%, and a security interest in property of JKE.  The Trustee has introduced no evidence that $1.6 million was not reasonably equivalent value for such a note.  Security interests and entitlement to interest payments are commonly given in exchange for loaned funds, and the Court sees no reason to conclude that less than reasonably equivalent value was given for the $1.6 Million Note.

Simultaneous with the Restructuring, each of the parties executed the Release.  Again, the Trustee has introduced no specific evidence that the Debtors received less than reasonably equivalent value in exchange for the Release.

26

Also in connection with the Restructuring, the Elrods received the Wire Transfer, a $3.5 million cash payment cancelling their secured note.  To demonstrate that JKE received reasonably equivalent value for the Wire Transfer, the Elrods point to the direct and indirect benefits conferred on JKE by the Restructuring as a whole.  First, they note that JKE received $6.3 million ($4.7 million received in connection with the M&E Sale Leaseback plus $1.6 million cash for the $1.6 Million Note).  But these amounts cannot do double duty, serving as reasonably equivalent value for the Restructuring and for the M&E Sale Leaseback and $1.6 Million Note.  The Court declines to consider these amounts for both purposes, and therefore must look to other value given to JKE in exchange for the Wire Transfer.

The Elrods identify the following other direct and indirect benefits conferred on JKE through the Restructuring:

- Cancellation of the earn-out note the Elrods received in the Buyout, and the release of the lien securing its payment;

- Release of the Elrods' security interest in a $2.3 million deposit account;

- Conversion by Fifth Third Bank – Ohio, Champlain, and the Mezzanine Lenders of a substantial amount of debt to equity;

- Substitution by Champlain of a new letter of credit in

27

favor of Safeco;

- Reduction of secured debt owing to the Elrods, in the amount of the Wire Transfer.

The last point -- that the $3.5 million Wire Transfer benefitted JKE by reducing its secured obligations to the Elrods by $3.5 million -- is dispositive.  Reduction of a preexisting obligation is value, and the Trustee has cited no authority to demonstrate to the Court that such value is not sufficient. Elway and the Elrods have thus produced evidence that value was given to JKE pursuant to the Restructuring, and, in the absence of evidence from the Trustee that such value was less than reasonably equivalent to the realizable commercial value of the assets transferred, the Court will grant summary judgment in favor of Elway and the Elrods with respect to the Trustee's constructive fraudulent transfer claims.

B.    *Equitable Subordination*

Finally, the Court reaches the Trustee's equitable subordination claim.  The Trustee seeks equitable subordination of Elway's $1.6 Million Note.  The Bankruptcy Code provides that a "court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated

28

claim be transferred to the estate." 11 U.S.C. § 510(c).

The leading Third Circuit case describing the standards for equitable subordination is <u>Shubert v. Lucent Techs. Inc. (In re Winstar)</u>, 554 F.3d 382 (3d Cir. 2009).  In the <u>Winstar</u> case, the Third Circuit adopted a three-part test for exercise of equitable subordination powers: (1) "[t]he claimant must have engaged in some type of inequitable conduct;" (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." <u>Id.</u> at 669-700 (citing <u>Benjamin v. Diamond (In re Mobile Steel Co.)</u>, 563 F.2d 692 (5th Cir. 1977)).  The court in <u>Winstar</u> further noted that "a claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." 554 F.3d at 412 (quoting <u>Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)</u>, 926 F.2d 1458, 1465 (5th Cir. 1991)).

The Court will consider each of these elements in turn.

1.  <u>Inequitable Conduct</u>

The Trustee claims that the Elrods, in their individual capacity and as sole owners of Elway, engaged in a purposeful scheme to strip JKE of its assets.  One transaction at a time, Elway and the Elrods acquired ownership of JKE's assets, but left them in JKE's possession through leasebacks.  When JKE failed to

29

make rental payments under those leases, Elway terminated the leases and retained the assets.  The Elrods then fired the majority of JKE's employees and promptly rehired them as employees of their new corporation, MSC.  The Trustee claims this was all part of a calculated plan contrived by the Elrods and effectuated by their failure to honor the Bonding Collateral Agreement.

The Trustee has introduced evidence that the Elrods misled Safeco and their own insurance broker, Ed Mournighan, about their obligations under the Bonding Collateral Agreement.  Mournighan testified in his deposition as follows:

> Q:  So when you had telephone conversations with Safeco . . . in advance of the meeting on September 7th, you didn't inform either Mike Ulrich or Dan Partin that there . . . was a commitment in place to provide the additional $3 and a half million in collateral which Safeco had been seeking since at least the beginning of of 2006?
>
> A:  If that agreement existed, I did not know about it.

E. Mournighan Dep. at 15-17.

Elway denies that the bonding collateral agreement was central to JKE's failure, and presents as evidence an earlier affidavit of Ed Mournighan stating that "Safeco would only consider continuing to provide bonds to Elrod Corporation if Dale Elrod and Jeff Elrod agreed to provide unlimited indemnities to support the Safeco bonds."  (Mournighan Aff. 3.)  The Trustee claims this affidavit was itself fraudulently procured because

Mournighan was kept in the dark about the Bonding Collateral Agreement and its potential impact on negotiations between Safeco and the Elrods.

The Trustee has presented evidence that the Elrods' alleged scheme, carried out through Elway, may have been premeditated. In an e-mail to Dan Partin and Michael Ulrich of Safeco, Ed Mournighan related a conversation he had with Dale Elrod shortly before the Restructuring. In that conversation, Dale explained that "the Elrods will be taking control of the company and actually buying all of the assets, including the equipment, etc." (E-mail of E. Mournighan, Ex. E to Partin Aff.)

Elway has not carried its burden of demonstrating that no material issues of fact exist with respect to its alleged inequitable conduct.

    2.  <u>Harm to Creditors</u>

Elway's alleged inequitable conduct harmed other creditors. Elway's sale and leaseback transactions withdrew assets from the Debtors' estate. In the Restructuring, the Mezzanine Lenders and Fifth Third Bank - Ohio were each induced to convert substantial amounts of debt to soon-to-be-worthless equity, while Elway received a secured note, substantially all of JKE's assets, and valuable releases. Champlain was persuaded to inject additional equity into JKE, which also soon became worthless. Further, the Trustee alleges the estate was harmed to the extent that JKE

could have continued as a viable company had Elway or the Elrods been willing to provide additional collateral to Safeco, as agreed to in the Bonding Collateral Agreement.

"[A] claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." <u>In re Mobile Steel</u>, 563 F.2d at 701.  The Third Circuit has stated that "quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer."  <u>Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims</u>, 160 F.3d 982, 991 (3d Cir. 1998). Therefore, "[a] bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination."  <u>Id.</u>

Genuine issues of material fact exist regarding the relative harms and benefits obtained by Elway and the Debtors' other creditors as a result of Elway's alleged inequitable conduct.

3.  <u>Consistency with the Bankruptcy Code</u>

The leading case on a court's powers under § 510(c) is <u>United States v. Noland</u>, 517 U.S. 535 (1996).  There, the United States Supreme Court held that "the bankruptcy court may not equitably subordinate claims on a categorical basis in derogation

of Congress's scheme of priorities." <u>Id.</u> at 536.  This means that courts are limited in their ability to reorder express statutory priorities by, for example, subordinating debt to equity.  <u>See</u> <u>Winstar</u>, 554 F.3d at 414.  But a court may subordinate the claims of creditors to other creditors.  <u>Id.</u> Here, the Trustee seeks subordination of Elway's $1.6 Million Note.  This Note may, consistent with the Bankruptcy Code, be subordinated to secured debt of Fifth Third Bank - Ohio or the Mezzanine Lenders.

In sum, Elway has failed to demonstrate that no genuine issue of fact exists for trial on the Trustee's equitable subordination claim.  The Court will accordingly deny the Motion as it relates to this claim.

## VI.   <u>CONCLUSION</u>

The Court will grant the Motion as it relates to the Trustee's actual and constructive fraudulent conveyance claims, and will deny the Motion as it relates to the Trustee's equitable subordination claims.  An appropriate order will issue.


BY THE COURT:

_____
Brendan Linehan Shannon
United States Bankruptcy Judge

Dated:    January 8, 2010
          Wilmington, Delaware